946 So.2d 708 (2006)
Arthur L. LEWIS, Jr., Plaintiff/Appellee,
v.
STATE FARM INSURANCE COMPANY and Leslie W. Brock, et al., Defendants/Appellants.
City of West Monroe, Plaintiff/Appellee,
v.
Leslie W. Brock and State Farm Insurance Company, Defendants/Appellants.
Carl Griffin and Betty Griffin, Plaintiffs/Appellees,
v.
Leslie W. Brock and State Farm Insurance Company, Defendants/Appellants.
Nos. 41,527-CA to 41,529-CA.
Court of Appeal of Louisiana, Second Circuit.
December 27, 2006.
Rehearing Denied January 18, 2007.
*714 Bolen, Parker & Brenner, Ltd. by Daniel Brenner, Alexandria, for Defendant/Appellant, Coregis Insurance Company.
The Boles Law Firm by P. Scott Wolleson, Monroe, Robert W. Kostelka, for Plaintiffs/Appellees, Arthur L. Lewis, Jr., Tonia Lewis, Carl Griffin and Betty Griffin.
Theus, Grisham, Davis & Leigh, L.L.P. by James M. Edwards, Monroe, for Intervenor/Plaintiff/Appellee, City of West Monroe.
Before STEWART, CARAWAY & MOORE, JJ.
STEWART, J.
These consolidated cases arise out of an automobile accident that occurred in October 1999. The jury awards of damages and the trial court's awards of penalties and attorney fees are challenged by all parties on appeal. For the reasons stated herein, we affirm in part, reverse in part and render.

FACTS
Plaintiff Carl Griffin was driving a pickup truck and Plaintiff Arthur Lewis *715 was a passenger in the truck, when they were involved in an accident. The truck was owned by the City of West Monroe (the "City") and both men were in the course and scope of their employment with the City sewerage department when the accident occurred. Coregis Insurance Company ("Coregis") provided UMunderinsured motoristcoverage for the city vehicle. The driver of the second vehicle, Defendant Leslie Brock, admitted fault for the accident. State Farm insured Mr. Brock's vehicle with limits of $25,000/$50,000 in bodily injury coverage.
Mr. Griffin and his wife Betty and Mr. Lewis and his wife Tonia sued Mr. Brock, State Farm and Coregis. The City intervened for reimbursement of past and future workers' compensation benefits paid to Mr. Griffin and Mr. Lewis. All suits were consolidated by joint motion.
Mr. Brock paid a ticket for failure to yield. State Farm paid its policy limits of $25,000 per claimant and secured Mr. Brock's release from the suit. The case proceeded against Coregis, with Plaintiffs seeking damages for permanent disability. Plaintiffs also argued that Coregis was in bad faith for refusing to tender payment under its policy. The case was tried before a jury in October 2004. The jury found Mr. Brock to be 100 percent at fault for the accident and that both Mr. Lewis and Mr. Griffin sustained injuries in the accident. It awarded damages to Mr. Lewis as follows (reproduced from the jury verdict forms):

 Mr. Lewis
 Past Medical Expenses $ 60,504.84
 Future Medical Expenses $ 18,334.80
 Past Lost Wages $ 17,333.00
 Future lost wages/loss of earning
 capacity $ 0
 Past physical pain and suffering $ 0
 Future physical pain and suffering $ 0
 Past mental anguish and emotional
 distress $ 16,500.00
 Future mental anguish and emotional
 distress $ 0
 Loss of enjoyment of life $ 0
 Disability $ 0

In addition, the jury awarded Mrs. Lewis $25,000 for loss of consortium. Further, finding that Coregis was arbitrary and capricious in failing to tender payment on Mr. Lewis' claim, the jury awarded him $125,000 "as a result of the breach of duty" by Coregis.
The jury awarded damages to Mr. Griffin as follows (reproduced from the jury verdict form):

 Mr. Griffin
 Past Medical Expenses $ 3,891.52
 Future Medical Expenses $ 0
 Past Lost Wages $ 0
 Future lost wages/loss of earning
 capacity $ 0
 Past physical pain and suffering $ 0
 Future physical pain and suffering $ 0
 Past mental anguish and emotional
 distress $ 0
 Future mental anguish and emotional
 distress $ 2,500.00
 Loss of enjoyment of life $ 0
 Disability $ 0

The jury awarded Mrs. Griffin $2,500 for loss of consortium. Finally, as with Mr. Lewis, the jury found that Coregis was arbitrary and capricious in failing to tender payment on Mr. Griffin's claim and awarded him $125,000 for that breach of duty.
In March 2005, the trial court awarded the City a lien for workers' compensation benefits to the extent of any damages awarded by the jury. Also in that March 2005 judgment, the trial court, under La. R.S. 22:1220 and 22:658, assessed penalties against Coregis in the amount of $50,000 per plaintiff and awarded cumulative attorney fees in the amount of $59,000.
Coregis appeals, arguing that the damages are excessive and penalties and attorney fees are not proper, or, alternatively, are excessive. Plaintiffs and the City answered, both seeking a de novo review and increased damages, penalties and attorney fees.

DISCUSSION
The manifest error standard applicable on appellate review provides that a *716 jury's verdict cannot be reversed unless the court, after reviewing the record in its entirety, finds there to be no reasonable factual basis for the jury's findings and determines them to be manifestly erroneous or clearly wrong. Stobart v. State Through DOTD, 617 So.2d 880 (La.1993). Where, however, legal error interdicts the fact-finding process, the manifest error standard no longer applies. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742. In such instances, if the record is complete, the appellate court is charged to make its own independent de novo review of the record. Id.
The supreme court has recognized that inconsistent jury verdicts may, in certain circumstances, constitute such legal error, requiring the appellate court to conduct a de novo review. See Green v. K-Mart Corp., 03-2495 (La.5/25/04), 874 So.2d 838. For example, when the jury has awarded special damages, but has declined to award general damages, the reviewing court must determine whether the jury's finding is "so inconsistent as to constitute an abuse of discretion." Id., citing Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70. If so, a de novo review is warranted.
In the case sub judice, we find it difficult, if not impossible, to discern the factual conclusions of the jury from the face of the jury verdict forms. It is clear, however, that the jury found that both Mr. Lewis and Mr. Griffin suffered injuries causally related to the accident that required medical treatment and that they continue to suffer from those injuries and will require medical treatment in the future. These conclusions are well supported by the record. We find, however, that the damages as recorded on the jury verdict form are inconsistent. Specifically, we find irreconcilable the jury verdict awarding special damages for past and future medical expenses (albeit not even equaling the stipulated medical expenses) and awarding general damages in the form of past mental anguish to Mr. Lewis and future mental anguish for Mr. Griffin. Further, the verdict reflects an unclear award for past lost wages to Mr. Lewis and awards an inordinate amount of damages to both plaintiffs for Coregis' alleged breach of its duty to tender. We find that the inconsistent awards constitute an abuse of discretion and legal error. Accordingly, we will conduct a de novo review of the record. Green, supra.

De novo review: assessment of damages
The record shows that the plaintiffs met their burden of proving negligence and damages. Mr. Brock admitted fault for the accident; and, as previously stated, we find that the record supports the conclusion that the accident caused the neck injury suffered by Mr. Lewis and the knee injury suffered by Mr. Griffin. We now turn to the question of damages.
The injuries and testimony
Mr. Griffin
Mr. Griffin, traveling east on Arkansas Road in West Monroe, collided with Mr. Brock's vehicle when Mr. Brock ran a stop sign attempting to turn left onto Arkansas road. Following the accident, Mr. Griffin drove himself and Mr. Lewis to the emergency room, where both men complained primarily of neck pain. Mr. Griffin was x-rayed and prescribed Flexeril and Lorcet for pain. In addition to his neck pain, Mr. Griffin began having pain in his left knee the morning following the accident. Apparently, he hit his kneecap on the dashboard of the truck on impact. Mr. Griffin sought treatment from Dr. James Patterson on October 19, 1999. Dr. Patterson, *717 qualified as an expert in family medicine, testified that Mr. Griffin presented with neck, back and arm pain, as well as knee pain/tenderness over the kneecap, with increased pain on weight bearing, but with a stable joint.[1] His impressions were cervical myofascial strain, lumbar sacral myofascial strain, left elbow strain and left knee strain. An x-ray of the knee showed "no acute changes" at that time. During November and December, Dr. Patterson instructed Mr. Griffin to continue the medications prescribed at the hospital and gave him stretching exercises to do along with a course of moist heat and muscle stimulation therapy. In January 2000, during his final visit with Mr. Griffin, Dr. Patterson noted that all of Mr. Griffin's complaints (neck, back and arm pain) had resolved; however, he complained of "slight" pain remaining in the left knee. Dr. Patterson released Mr. Griffin from treatment for injuries sustained in the accident opining that "[t]he residual symptoms of the knee were expected to resolve over the following four weeks or so."
Mr. Griffin then sought treatment from Dr. Douglas Brown, orthopedic surgeon, on May 9, 2000.[2] An MRI of Mr. Griffin's knee revealed a "lump of tissue" above the kneecap, which Dr. Brown called a hypertrophic synovial lump. Dr. Brown opined that it looked like an area that had been bruised and formed a "hard lumpy nodule." Mr. Griffin underwent surgery to remove the lump on May 30, 2000, but continued to experience pain post-surgery. Dr. Brown testified that Mr. Griffin had a difficult time regaining strength in that knee and, two years post-surgery, there was a ½-inch shrinkage in Mr. Griffin's left thigh and weakness in the left knee. Mr. Griffin experienced a deterioration of cartilage behind the kneecap, a condition called patellofemoral chondromalacia. According to Dr. Brown, this condition could require a patellectomy, or removal of the kneecap, depending on Mr. Griffin's level of activity and stress placed on the left knee. Dr. Brown released Mr. Griffin following the knee surgery, with no restrictions. Dr. Brown opined, however, that Mr. Griffin would have difficulty performing some of the activities of his former job, such as crouching, kneeling and climbing, and that these types of activities would lead to a worsening of his condition and could necessitate the patellectomy as noted above.
Mr. Griffin did not work for two weeks post-accident. He returned to full duty until March 31, 2000, when Dr. Brown restricted him to light duty with no climbing or squatting. Thereafter, Mr. Griffin was reassigned and worked light duty until May 9, 2000, when he was discharged for allegedly sleeping on the job. While Mr. Griffin disputes this reason for his discharge, he has not worked since. Despite his discharge, the City deemed Mr. Griffin disabled and continues to pay him indemnity benefits.
Mr. Lewis
Mr. Lewis testified that he was talking to and looking at Mr. Griffin when the impact occurred, which caused his neck to snap forward while his head was turned to the left. He described the pain as having hot liquid poured down his neck and into his shoulder area immediately following *718 impact. Mr. Lewis reported his neck pain to the emergency room physician. Dr. Ralph Asbury, the attending physician, diagnosed cervical and left trapezius myofascial strain. X-rays of the cervical spine were negative. Mr. Lewis was prescribed Flexeril and Lortab and instructed to see a family doctor if his condition did not improve or if it worsened. Mr. Lewis did not report to work the day after the accident, but did return to work the following day.
On October 22, Mr. Lewis sought treatment for his injury from Dr. Ronald Woods, who was qualified by the court as an expert in general family medicine. Dr. Woods treated Mr. Lewis for two months following the accident and diagnosed him with cervical spine strain and left shoulder strain, which he explained to be an acute injury that led to a chronic condition over time. Dr. Woods treated Mr. Lewis with muscle relaxers, anti-inflammatories, pain medication and physical therapy to his cervical spine and trapezius muscle. An MRI during this time showed only normal degenerative changes, which, according to Dr. Woods, make a person know he or she is injured quicker and slow down the recovery time when compared to a younger person with a similar injury. Dr. Woods also administered trigger point injections to relax spasming muscles in an effort to relieve pain. During the two months following the accident, Mr. Lewis continued working in his capacity of supervisor for the City. Thereafter, he was given another position, as lift attendant, which was a demotion in terms of work requirements, but Mr. Lewis's salary remained the same.
Dr. Woods referred Mr. Lewis to Dr. Ronald Ellis for pain management. Dr. Ellis was qualified as an expert in chronic pain management. He treated Mr. Lewis from December 1999 to October 2003, when he relocated his practice to Missouri, at which time Dr. Vincent Forte, Dr. Ellis' former partner, took over care of Mr. Lewis. Under Dr. Ellis' care, Mr. Lewis continued to work, as lift attendant, for seven months. On August 1, 2000, Dr. Ellis took him out of work because of pain.
Dr. Ellis diagnosed Mr. Lewis with neck, upper back pain, or myofascial left cervical paraspinus and trapezius pain with four discrete trigger points, with mild lower cervical midline strain or sprain. This diagnosis was primarily muscular and was treated with trigger point injections and narcotic pain medication. In April 2001, Dr. Ellis released Mr. Lewis to return to medium level work and recommended a driving test. Mr. Lewis testified that he advised the City of this; however, he was never notified when and/or where to report back to work.
In June 2001, Dr. Ellis changed his opinion of Mr. Lewis' injury, testifying that, at this point, he considered possible spinal involvement of the cervical and thoracic facet joints. Over the course of approximately the next two years, Mr. Lewis was treated with various injections, including botox, trigger point and epidural steroid injections, experiencing different levels and durations of relief. His pain medication regimen was adjusted intermittently. In October 2003, in addition to the extended release narcotic pain medication, Dr. Ellis prescribed OxyContin IR (immediate release) for breakthrough pain during "flare-ups." Dr. Ellis testified that, at this time, he would have prescribed a driving test and another functional capacity test before wanting Mr. Lewis to return to work. He testified that Mr. Lewis' pain was more than likely permanent and that he would have to continue taking these medications to improve his functionality and quality of life.
Dr. Forte, qualified as an expert in pain management medicine, testified in deposition that he began seeing Mr. Lewis in *719 January 2004. In Dr. Forte's opinion, Mr. Lewis had degenerative stenosis at C3-4, 4-5 and 5-6, that were aggravated by the accident, triggering Mr. Lewis' pain response. Physical therapy provided limited relief; trigger point injections and epidural steroid injections also provided temporary relief of pain. Dr. Forte testified that Mr. Lewis was not a candidate for surgery; rather, under Dr. Forte's care, Mr. Lewis was prescribed various narcotic pain medications, anti-inflammatory medications and medications for depression associated with the injury/pain. Mr. Lewis also executed a narcotic treatment agreement acknowledging the risks of narcotic pain medication and agreeing not to drive or operate heavy machinery while taking narcotics.[3]
Dr. Forte further testified that Mr. Lewis' condition would continue as it was, with no likely improvement, although he should remain stable if he continues the pain medication regimen. At the time of trial, Mr. Lewis was taking OxyContin (timed release), OxyContin IR (immediate release for break-through pain), Elavil (sleep aid), Wellbutrin (anti-depressant) and Celebrex (anti-inflammatory). Each of the medications was prescribed by Dr. Forte. The record is consistent that Mr. Lewis only received prescriptions for his narcotic pain medication from Dr. Ellis and then Dr. Forte and there is no indication in the record that he took the medications other than as prescribed.
Dr. Ed McGuire also testified on behalf of Mr. Lewis. Dr. McGuire was qualified as an expert in mental health counseling and was referred by Dr. Ellis for biofeedback training for Mr. Lewis in April 2001. Dr. McGuire conducted a psychological profile of Mr. Lewis and testified that Mr. Lewis' pain was not psychogenic and that he believed the accident precipitated Mr. Lewis' depression, sexual problems, anger and anxiety. He opined that Mr. Lewis' inability to work was very difficult for him and that he did not believe that Mr. Lewis was malingering or magnified his symptoms.
Dr. McGuire described biofeedback training generally as being various relaxation techniques that are designed to reduce stress and pain. Mr. Lewis chose not to receive this therapy because he did not believe such therapy would benefit him, and it was Dr. McGuire's opinion that Mr. Lewis attached somewhat of a stigma to mental health therapy. Beyond the original profile, therefore, Dr. McGuire provided no treatment to Mr. Lewis.
Also during the time period that Dr. Ellis was treating Mr. Lewis, Dr. Donald Smith, appointed as independent medical examiner and qualified as an expert in neurosurgery, examined Mr. Lewis on two occasions, May 8, 2000, and January 22, 2001, and testified on behalf of Defendants. Dr. Smith testified that, on the May 8 visit, Mr. Lewis complained of a sharp knife-like pain between his shoulder blades and dull aching. Mr. Lewis, however, exhibited normal range of motion of his neck and shoulder with no complaints of severe pain. Dr. Smith noted no tightness or muscle spasms on palpation and no trigger points. *720 He found no dysfunction of the spinal cord and no tenderness of the brachial plexus, which is the bundle of nerves running from the neck to the upper arm, or the nerves around the elbow, indicating no nerve irritation. He noted that the December 1999 MRI that he reviewed was not of the best quality, but he believed it to be completely normal. Dr. Smith noted Mr. Lewis to have cervical strain (or soft tissue injury), probably aggravated by emotional factors related to the litigation. He found only musculature/ligament injury with no disk or vertebrae involvement and no involvement of the neurological system. He opined that Mr. Lewis was at maximum medical improvement, i.e., his condition was stable, at the May 2000 appointment and testified that he advised Mr. Lewis that his pain medication regimen was excessive. He further stated that he did not believe that epidural steroid injections would be indicated because he found no nerve irritation. Recall that, during this time (2000-2001), Mr. Lewis was being treated by Dr. Ellis and was receiving trigger point and epidural injections.
Dr. Smith further testified that, at the January 22, 2001 appointment, Mr. Lewis was overtly depressed and provided the same history of pain as the May 2000 appointment, adding a complaint of headaches, which Mr. Lewis stated were diminished by trigger point injections he was receiving. Dr. Smith's conclusions following this physical exam were unchanged from the May 2000 visit.
Dr. Smith conducted a functional capacity testing of Mr. Lewis at this time, which measures basic strength, exertion and physical conditioning. According to Dr. Smith, Mr. Lewis performed well on the exam, showing good effort, strength in lifting and physical exertion. He exhibited mild deconditioning, but, in Dr. Smith's opinion, "performed at a level that would normally qualify one for heavy work activities." Dr. Smith concluded that Mr. Lewis' limitations on his work ability were primarily psychological and that he should continue to undergo counseling. He further stated that trigger point or botox injections may be helpful for temporary, not long-term, relief of pain symptoms. He opined that, for this reason, despite his performance on the functional capacity testing, Mr. Lewis could not perform his "former work activities." Again, Dr. Smith's opinion was that this was not due to physical injury, but to the stress Mr. Lewis suffered related to the litigation of this matter.
Dr. Smith concluded that there was no basis for an impairment rating and that Mr. Lewis could work at least medium work activities, with some heavy work. Regarding the continued, long-term use of narcotic pain medications, Dr. Smith opined that such medication was not indicated in a patient without any abnormal physical or radiographic findings as Mr. Lewis. He did not believe that Mr. Lewis would benefit from long-term management including narcotics.
Dr. Paul Ware also testified for the Defendants. Qualified as an expert in forensic psychiatry, Dr. Ware was asked by Coregis to evaluate Mr. Lewis and testify as to any psychological component that would impair Mr. Lewis' ability to work. Dr. Ware evaluated Mr. Lewis on July 19, 2001, by which time Mr. Lewis had been released by Dr. Ellis to return to medium level work. Dr. Ware described symptoms of mild to moderate depression and related Mr. Lewis' complaints of pain at the base of his skull and shoulder blades. He diagnosed Mr. Lewis with mild chronic depression, but opined that this did not in any way prevent Mr. Lewis from being able to work. Dr. Ware noted that Mr. Lewis did not seem "disoriented" or "confused" or as *721 if he was "not thinking clearly" because of the pain medication he was taking. Dr. Ware agreed that Mr. Lewis did not seem to be magnifying his symptoms, concluding that there were no psychiatric conditions that would prevent him from working.
In summary, Mr. Lewis has not worked since August 2000 when Dr. Ellis took him out of work. In April 2001, when Dr. Ellis released him to medium duty work, the City did not contact him with job placement. According to the City, based on his use of narcotic pain medications and his execution of the above-mentioned narcotics treatment agreement, Mr. Lewis presents too great a risk to himself and others to continue working for the City. Mr. Lewis is, however, considered to be an employee of the City. He has been deemed disabled and continues to receive indemnity benefits.
Medical Expenses
Both Plaintiffs seek past and future medical expenses. The parties stipulated to past medical expenses prior to trial. Thus, we award the stipulated amounts of $91,674.85 for past medicals to Mr. Lewis and $28,891.52 to Mr. Griffin.
The cost of future medical treatment and expenses cannot be precisely measured; however, the plaintiff must still establish future medical expenses with some degree of certainty through medical testimony that such expenses are indicated and their probable cost. Sepulvado v. Turner, 37,912 (La.App.2d Cir.12/10/03), 862 So.2d 457.
Regarding Mr. Lewis' chronic neck pain, Dr. Forte testified that Mr. Lewis would need to maintain his medication regimen and have multiple injections each year for the rest of his life. Dr. Forte did not provide testimony establishing the cost of the medications or treatment. Economist Charles Bettinger testified that he utilized a formula to calculate a figure of $358,411 as Mr. Lewis' future medical expenses, representing his continued use of three of his current medications and four doctor visits per year with injections at $13,550 per year. Significantly, however, we note that, while the record indicates that Mr. Lewis may very well need pain medications of some kind for the rest of his life, the doctors' testimony was not clear as to exactly which medications he would need. Dr. Forte testified that Mr. Lewis' medication regimen may need to be adjusted from time to time, as it has in the past. In addition, the record is not clear what types of injections Mr. Lewis may need, whether trigger point injections and/or epidural steroid injections, or how often they will be needed. Finally, the testimony indicates that other treatment options, such as botox injections, may be available, but may not be necessary. Dr. Smith opined that Mr. Lewis' current medication regimen is excessive and that he does not believe that epidural steroid injections are indicated for Mr. Lewis because he did not find any neurological involvement. He did testify that trigger point injections may be helpful for the temporary relief of muscle spasms.
We find that Mr. Lewis will likely require some medication for the rest of his life to manage his pain and he may well require intermittent trigger point injections to ease muscle spasms in his neck and left trapezius muscle. In light of the uncertainty of Mr. Lewis' future medical needs, we find Dr. Bettinger's figure to be excessive. The record supports an award of $30,000 to compensate Mr. Lewis for the future costs of treatment for his chronic pain.
The only evidence of any possible future medical expenses for Mr. Griffin is the speculative testimony of Dr. Brown regarding surgery to remove the kneecap *722 if certain activities are performed and if the condition of the cartilage behind the kneecap continues to deteriorate. Both physicians who treated Mr. Griffin's injuries have released him from treatment. We find no basis upon which to award any future medical expenses to Mr. Griffin.

Lost wages and loss of earning capacity
A plaintiff bears the burden of proving his claim for lost earnings. For purposes of determining this type of damages, the amount of lost earnings need not be proved with mathematical certainty, but by such proof as reasonably establishes the claim. Williams v. Enriquez, 41,200 (La.App.2d Cir.6/28/06), 935 So.2d 269, citing Driscoll v. Stucker, 04-0589 (La.1/19/05), 893 So.2d 32; and Corder v. Lively, 39,780 (La.App.2d Cir.6/29/05), 907 So.2d 824. To recover for actual lost wages, a plaintiff must prove positively that he or she would have been earning wages but for the accident in question. Id., citing Boyette v. United Services Automobile Association, 00-1918 (La.4/3/01), 783 So.2d 1276; Corder, supra. Reasonable certainty is the standard. Driscoll, supra.
Since awards for future lost income are inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty, the courts must exercise sound judicial discretion to determine these awards. Nesbitt v. Nesbitt, 40,442 (La.App.2d Cir.1/13/06), 920 So.2d 326, writ denied, 06-0720 (La.6/2/06), 929 So.2d 1255. The awards should be consistent with the record. Robbins v. State ex rel. Dept. of Labor, 31,590 (La.App.2d Cir.2/24/99), 728 So.2d 991.
First, we find that Mr. Griffin sustained minimal past lost wages and find no basis for an award of loss of future earning capacity. Mr. Griffin was off of work for two weeks following the accident. The only work restriction that Mr. Griffin received was in March 2000 from Dr. Brown which restricted him to light duty. The City accommodated this restriction, without a decrease in pay, and Mr. Griffin worked the new position until he was discharged for allegedly sleeping on the job.
Although the record indicates some effort on the part of Mr. Griffin to find alternate employment and Dr. Brown testified that he should restrict his activities to light duty, we find no evidence to support the conclusion that Mr. Griffin could not have earned wages at any time after this accident. We recognize that he underwent knee surgery shortly after being relieved of his duties with the City; however, there was no restriction placed on him after his recovery from surgery and there is no indication in the record that he was unable to work following the surgery.
Using a formula that considered an entry level offset and diminished earning capacity, Dr. Bettinger testified that he calculated Mr. Griffin's past and future lost wages at $662,542. This conclusion was based on the assumption that Mr. Griffin was unemployable. For stated reasons, we reject this assumption and, therefore, reject Dr. Bettinger's calculations.
Lisa Spann, a vocational rehabilitation counselor, performed a vocational assessment of job opportunities for Mr. Griffin in February 2003. She testified that Mr. Griffin's opportunities were limited by his education and physical restrictions, i.e., stooping, squatting and climbing. We acknowledge Mr. Griffin's limited restrictions; however, we find significant that the City accommodated these minimal restrictions and Mr. Griffin had no trouble performing his job duties commensurate with his education and abilities until he was fired. Mr. Griffin made approximately *723 $20,000 per year with the City. The record supports an award of $800 for two weeks of past lost wages for Mr. Griffin, but does not support an award of loss of future earning capacity.
Mr. Lewis worked in some capacity for the City, at the same salary he enjoyed before the accident, for nine months after the accident. Dr. Ellis took Mr. Lewis out of work on August 1, 2000, and then released him to return to work in April 2001. We find that Mr. Lewis is entitled to compensation for wages lost during this nine-month period in the amount of $20,247, representing nine of twelve months' salary at a yearly gross of $26,996 as per Mr. Lewis' 1999 W-2.
Upon his release to return to work in April 2001, Mr. Lewis advised the City that he could return to work, but was not reinstated to his duties. Although he was released to medium level duties, the City acknowledges that it did not have Mr. Lewis return to work because of the safety hazard he presented to himself and others due to his signing of the narcotics treatment agreement and the possible safety risk that he posed to himself and others due to the medications he was taking. Mr. Lewis did not pursue the City to return to work, nor did he seek alternate employment.
Dr. Ware testified that Mr. Lewis was taking his narcotic pain medications as prescribed when he evaluated him in July 2001 and Dr. Ware found no reason associated with Mr. Lewis' level of depression or his medication regimen that should prevent him from working. He further testified that, generally, that are many individuals who are receiving chronic pain management therapy, including the taking of narcotic medications, who remain productive members of the workforce. There was also testimony regarding a driving assessment that is available to Mr. Lewis to determine his level of competency to drive for work purposes. We find unpersuasive the testimony of the vocational counselors who opined that Mr. Lewis is basically unemployable because of his pain medication regimen.
In addition, Mr. Lewis has been released by his pain management doctor to medium level work and Dr. Smith opined that his functional capacity test indicated that he is strong enough to perform some heavy level work activities. For these reasons, we reject Mr. Lewis' claim for loss of earning capacity.
General damages
General damages are those which cannot be fixed with pecuniary exactitude. Maranto v. Goodyear Tire & Rubber Co., 25,114 (La.App.2d Cir.5/10/95), 661 So.2d 503. In making an initial award of damages, we set the award in an amount determined to be just compensation for the damages shown by the record. Id.
There is no mechanical rule for determining general damages; rather, the facts and circumstances of each case must be considered. Maranto, supra. Severity and duration are factors to be considered in determining an award for pain and suffering. Id. An award for loss of enjoyment of life requires showing that the plaintiff's lifestyle was detrimentally altered or that the plaintiff had to give up activities because of the injury. Day v. Ouachita Parish School Board, 35,831 (La.App.2d Cir.8/8/02), 823 So.2d 1039, writ denied, 02-2532 (La.12/19/02), 833 So.2d 343.
The record supports that Mr. Griffin suffered temporary pain and underwent treatment for several months for his neck and back injuries caused by the accident. On resolution of those injuries, he continued to experience left knee pain, *724 eventually requiring surgery to remove cartilage above his kneecap. He has experienced residual pain and weakening and had a somewhat delayed recovery. Mr. Griffin's activities may be somewhat restricted in his left knee, i.e., stooping, squatting and climbing may result in minor pain or worsening of his condition over time. Considering all of the facts of this case relative to Mr. Griffin's pain and suffering, loss of enjoyment of life and mental anguish, we award $5,000 in general damages.
Mr. Lewis sustained an injury to his neck which has resulted in chronic pain in his neck and left shoulder that will require some level of pain management therapy to ease his discomfort over the rest of his lifetime. Mr. Lewis was 45 at the time of the accident and was active. He testified that his daily activities have been affected and that he is no longer able to engage in the same level of activity he enjoyed prior to the accident. He can no longer take care of his home and yard as he did before and his physical intimacy with his wife has been negatively affected. He suffers from depression and anxiety, largely related to the stress from the litigation. We find general damages in the amount of $40,000 will appropriately compensate Mr. Lewis for pain and suffering, mental anguish and loss of enjoyment of life.

Loss of Consortium claims
In general, a claim for loss of consortium has seven elements: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Nesbitt, supra, citing, Bassett v. Toys `R' Us Delaware, Inc., 36,434 (La. App.2d Cir.12/30/02), 836 So.2d 465, writ denied, 03-0560 (La.4/25/03), 842 So.2d 408; Maranto, supra.
Considering these factors, we find an appropriate loss of consortium award for Mrs. Griffin to be $1,000. Regarding Mrs. Lewis, we note that she does most of the driving for Mr. Lewis and was very emotional in her testimony when asked how his injuries have affected their lifestyle. We also note that the two had only been married for approximately two years when the accident occurred. We note, however, that there was not an abundance of testimony regarding how Mrs. Lewis' daily activities or physical relationship with her husband were altered after the accident. Based on the testimony presented, we award $5,000 to Mrs. Lewis for her loss of consortium.
Finally, Louisiana law allows, as an element of damages, reasonable housekeeping expenses necessitated by the incapacity of an injured spouse. Brandao v. Wal-Mart Stores, Inc., 35,368 (La.App.2d Cir.12/19/01), 803 So.2d 1039, writ denied, 02-0493 (La.4/26/02), 814 So.2d 558, citing Maranto, supra. We conclude that these general damage awards sufficiently include compensation for any loss of household ability/services that the Lewises or Griffins sustained as a result of the injuries caused by the accident.

Statutory Damages, Penalties and Attorney Fees
Failure to tenderstatutory damages and penalties under La. R.S. 22:1220
At the outset, we note that the jury awarded $125,000 to each plaintiff for damages as a result of Coregis' breach of its duty of good faith in failing to tender payment of the undisputed amount of the claims. This award is clearly excessive and an abuse of discretion under La. R.S. 22:1220, infra, and is irreconcilable as a *725 penalty award under 22:658. After a post-trial hearing on penalties and attorney fees, the trial court awarded the Lewises and Griffins $50,000 in penalties under La. R.S. 22:1220(C) and $59,000 in attorney fees under La. R.S. 22:658. As previously stated, we review all awards in this case de novo and make the following awards.
La. R.S. 22:1220 provides, in pertinent part:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured to the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
* * *
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
It is undisputed that Coregis never tendered payment on Mr. Lewis' or Mr. Griffin's claims, eventually denying the claims several years post-accident. Plaintiffs submit that the failure to tender was in bad faith, arbitrary and capricious; and, therefore, they are entitled to statutory damages under subsection (A), penalties under subsection (C) and attorney fees under La. R.S. 22:658, discussed infra. Plaintiffs also claim that Coregis made alterations to the policy to add an exclusion after it had received notice of their claims. We will first address the issue of bad faith and fair dealing and the imposition of statutory damages under Subsection (A).
A plaintiff seeking penalties for an insurer's breach of good faith and fair dealing has the burden of proof. Ramirez v. Ware, 28,879 (La.App.2d Cir.9/25/96), 680 So.2d 1302. To prevail on a claim of breach of duty, the insured must prove that the insurer knowingly committed actions which were completely unjustified, without reasonable or probable cause or excuse. Holt v. Aetna Cas. & Sur. Co., 28,450 (La.App.2d Cir.9/3/96), 680 So.2d 117, writs denied, 96-2515, 96-2523 (La.12/6/96), 684 So.2d 937, 938. "In bad faith actions, the insured is seeking extra-contractual damages, as well as punitive damages. Therefore, the insured's burden is great." Id.
We agree with Plaintiffs that Coregis breached its duty of good faith and fair dealing and failed to adjust the claims fairly and promptly regarding both Plaintiffs. We further find that Coregis acted arbitrarily and capriciously in failing to timely tender the undisputed amount. The comprehensive liability policy issued by Coregis to the City included UM coverage *726 with limits of $1,000,000 on its vehicles, with a $2,000,000 umbrella. The premium was over $214,000 per year. For several years, these claims were tossed around from office to office, adjuster to adjuster, with tender never being made. During this time, both men were receiving workers' compensation benefits; and, according to Plaintiffs, Coregis was aware of the sizable nature of the claims. In February 2002, a letter from Coregis adjuster, Shellie Prangle, stated that the reason for denial was as follows:
We are enclosing a copy of our policy and draw your attention to specific policy language, which indicates that workers' compensation is specifically excluded in payment of those benefits under the policy. Therefore, [UM] is excess to workers' compensation benefits.
Plaintiffs argue that the language in the policy to this effect was added after the accident at issue and was actually taken from a policy issued to St. Martin Parish Governmentthe added endorsement names St. Martin Parish as the insured and that policy was issued to St. Martin Parish in 2000after this accident occurred. Terry Duke, the agent who brokered the Coregis policy for the City, confirmed this post-claim alteration of the Coregis policy. Mr. Duke was also the agent for St. Martin Parish. Mr. Duke stated that this endorsement could not have been in the original Coregis policy insuring the City because St. Martin did not even become an insured of Coregis until 2000. The limit on the St. Martin endorsement was also altered to reflect the correct coverage limit for the City.
Plaintiffs point out that Coregis presented no witness to explain the alteration at trial and did not present any witnesses who were actually involved in the decision to deny these claims. Mary Catherine Vener, Coregis' representative who testified at trial, and Venice Conley, whose deposition testimony was introduced, testified that the claims were denied because the claims did not exceed the $25,000 policy limits. Review of these witnesses' testimony clearly indicates that neither adjuster had any medical knowledge of either Plaintiffs' injuries or treatment. In fact, the witnesses admitted that they did not have, nor had they reviewed, any medical records for either Mr. Lewis or Mr. Griffin.
Ms. Conley was Coregis' designated representative who had been involved in the handling of these claims. The record indicates that Ms. Conley handled these files for approximately one year.[4] Ms. Conley testified that, in her opinion, this was a minor accident that could not have caused injuries as suggested by the claimants. She stated that it was Coregis' position that the $25,000 settlement by State Farm more than compensated both claimants for their injuries and formed the basis for Coregis' denial of the claims.
We find the majority of Ms. Conley's testimony, as described herein, to be significantly lacking in substance and value. Specifically, Ms. Conley testified that Coregis received notice of the claim in October 1999. She testified that this was her first Louisiana claim and that, although she completed Coregis' training program, she was unaware that Coregis was required by law to tender the undisputed amount of the claim. Ms. Conley stated that medical records were reviewed for both claimants; however, she had no knowledge of Mr. Lewis' medical condition, other than to make the unsubstantiated claim that he was "doctor shopping" for *727 OxyContin because he was addicted.[5] Her testimony was consistent throughout her deposition that she only reviewed records and information provided to her by defense counsel and it was only on that information that she based her testimony. Ms. Conley admitted that she made no effort to confirm her conclusion that Mr. Lewis was abusing his medications.
Regarding Mr. Lewis' injury, Ms. Conley did not know any diagnoses that had been made, did not know what medications he was taking and did not recall anything about any psychological evaluations that had been made. Ms. Conley made blanket statements that some of Mr. Lewis' doctors "say he was magnifying his problem" and that the force of the impact could not have caused the damage he was claiming at trial. Ms. Conley testified that the amount of property damage alone was reason to deny the claim. Ms. Conley denied that Mr. Griffin had sustained a knee injury in the accident and did not know what chondromalacia is.
Remarkably, Ms. Conley testified that Coregis was still "investigating the injuries" in these claims five years post-accident and that she would not know the extent of the injuries "until [Mr. Lewis] stops treating." She stated that Coregis could withhold payment on the claims until the claimant stops treating. Ms. Conley finally admitted in her deposition that Coregis did not review Mr. Lewis' medical records and it was improper to deny a claim without doing so. In addition, Ms. Conley verified that there were handwritten alterations to the exclusion as described above, changing not only the insured, but also the policy limits.
Ms. Vener, also a representative of Coregis, described with limited clarity how the file had been passed among adjusters and offices and that she never was "involved" with the file. She became involved the week prior to trial. Most significant in Ms. Vener's testimony was her agreement that it would be an arbitrary decision (referring to Ms. Conley's position) to say that someone is treating for life; and, therefore, we have to "wait and see" what the extent of the injuries are before a tender is made.
We conclude, based on the evidence presented, that Coregis' actions in delaying these claims were completely unjustified; and, in fact, we can discern no basis for denying the tender from the evidence submitted. Coregis received timely notice of the claims and was receiving medical records indicating its knowledge of the rising values of the claims, yet failed to make any tender whatsoever for years. Its representative even testified that the investigation of the injuries is not complete and that Coregis is under no obligation to tender so long as treatment of the insured is ongoing. We conclude that Coregis breached its duty of good faith and to fairly and promptly adjust these claims. In light of our finding of bad faith regarding the failure to tender within sixty days, we pretermit any discussion concerning Coregis' alleged alteration of the policy/exclusions.
Having decided that a breach occurred, we turn to the issue of damages. Subsection (C) of the statute expressly allows for "any damages sustained as a result of the breach." The statute providing for penalties against the insurer for *728 breach of duty of good faith and fair dealing is applicable only after there is a showing of damages actually suffered as a result of breach of insurer's duties. See Calogero v. Safeway Ins. Co. of Louisiana, 99-1625 (La.1/19/00), 753 So.2d 170.[6]
Applied to the case sub judice, we find that neither Mr. Lewis nor Mr. Griffin sustained any pecuniary compensable damages as a direct result of Coregis' failure to tender. As previously stated, both men were receiving workers' compensation benefits and medical bills were being paid. Plaintiffs argue, however, that there were actual damages resulting from Coregis' failure to fulfill its duty to Mr. Lewis. We agree that Plaintiffs sustained extra-contractual general damages in the form of mental anguish and emotional distress associated with pursuing this claim that Coregis, in bad faith, failed to timely pay. Mr. Lewis became depressed and sought counseling with his wife to deal with how he was affected by the accident and Coregis, scandalous allegations of doctor shopping, magnifying his injury and walking off of his job. The record supports the conclusion that litigation stress and depression added to Mr. Lewis' physical symptoms. At many of the doctor visits, records indicate that depression, particularly due to the litigation and Coregis' accusations, permeated Mr. Lewis' life over the course of this ordeal. We award Mr. Lewis $8,000 in damages for Coregis' breach of its duty of good faith and fair dealing.
Plaintiffs acknowledge that the evidence is not as strong for Mr. Griffin, but argue that it is reasonable to infer that Mr. Griffin faced a similar plight as Mr. Lewis. According to Plaintiffs, Coregis accused Mr. Griffin of causing the accident and fabricating the knee injury and it ridiculed his efforts to find another job, describing his search for employment as "a full time job." We find credible evidence in the record to support an award of $2,500 in damages to Mr. Griffin for the breach of good faith.
The measure of penalties for the breach of this duty is found in Subsection (C) and is defined as either twice the amount of damages sustained or $5,000, whichever is greater. We, therefore, award Mr. Lewis $16,000 in penalties (two times his damages of $8,000). We award Mr. Griffin $5,000 in penalties (two times his damages of $2,500).
Attorney fees under La. R.S. 22:658
An award of penalties under La. R.S. 22:1220 does not preclude an additional award of attorney fees under La. R.S. 22:658. The version of La. R.S. 22:658 that was in effect at the time this suit was filed read, in pertinent part, as follows:
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1), or within thirty days after written agreement or settlement as provided in R.S. 22:658(A)(2) when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ten percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, together with all reasonable attorney fees for the prosecution *729 and collection of such loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount.
We initially note that Coregis argues that Plaintiffs' supplemental petition was filed after 22:658 was amended to delete the provision for attorney fees and making attorney fees available only in cases involving third party use of an automobile. La. R.S. 22:658 was amended on June 27, 2003, eliminating the attorney fees provisions. Since, however, Plaintiffs' causes of action arose prior to this amendment, they are entitled to attorney fees as provided by the version of the statute in effect at that time. Geraci v. Byrne, 06-58 (La.App. 5th Cir.6/28/06), 934 So.2d 263, writ denied, 06-1850 (La.11/9/06), 941 So.2d 42.
The proscribed behavior on the part of the insurer is virtually identical to that in 22:1220. The only difference between the two statutes is the time period within which the insured must pay (30 days in 22:658 and 60 days in 22:1220), the amount of the penalties available and the provision for recovery of attorney fees in 22:658.
Arbitrary and capricious behavior consists of willful and unreasonable action, without consideration and regard for the facts and circumstances presented, or of seemingly unfounded motivation. Reed v. State Farm Mutual Auto. Ins. Co., 03-0107 (La.10/21/03), 857 So.2d 1012. Whether or not a refusal to pay is arbitrary, capricious or without probable cause depends primarily on the facts known to the employer or insurer at the time of its action. Reed, supra; Lynn v. Berg Mechanical, Inc., 582 So.2d 902 (La.App. 2d Cir.1991). A UM carrier is obligated to act in good faith and deal fairly in paying the claim of its insured. Haynes v. Shumake, 582 So.2d 959 (La.App. 2d Cir.1991), citing Hastings v. Southern National Ins. Co., 554 So.2d 221 (La.App. 2d Cir.1989), writ denied, 559 So.2d 126 (La.1990). This obligation includes the duty to reasonably investigate the claim. Id.
As previously discussed, we find that Coregis' failure to tender was arbitrary and capricious, thereby entitling Plaintiffs to relief under 22:658. Sufficient proof of loss is not disputed; Coregis was supplied with timely notice of claim and received medical records for both claimants. No reasonable investigation was conducted as admitted by both Coregis representatives. Several years elapsed before Coregis ever responded to the claims. We find, therefore, that the Lewises and Griffins are entitled to attorney fees.
As previously stated, the trial court awarded the Lewises and Griffins, cumulatively, $59,000 in attorney fees. In determining an award of attorney fees to be assessed under La. R.S. 22:658, a trial court should consider the services needed to effect recovery, the degree of professional skill and ability exercised, the volume of work performed, the time devoted to the case, the result obtained, the amount in controversy, the novelty and difficulty of the questions involved and the percentage fixed for attorney fees in a plaintiff's contract. Minsky v. Shumate, 40,375 (La.App.2d Cir.3/10/06), 924 So.2d 488. The trial court must base its award of attorney fees on the attorney's efforts expended for the prosecution and collection of the loss, that being the amount of any claim due the insured, rather than on the total recovery awarded. See Desoto v. Balbeisi, 02-0169 (La.App. 1st Cir.12/20/02), 837 So.2d 48, writ denied, 03-0672 (La.5/9/03), 843 So.2d 399. The *730 trial court's conclusion with respect to the assessment of penalties and attorney fees is, in part, a factual determination and should not be disturbed in the absence of a finding that it was manifestly erroneous. Bauer v. White, 532 So.2d 506 (La.App. 1st Cir.1988).
At the hearing on the matter of penalties and attorney fees, Plaintiffs introduced an affidavit of fees and an itemized billing record of time spent pursuing collection of the claims. Coregis argues that the attorney fees award should be reduced to reflect only those fees incurred for prosecution of the issues of bad faith and should not include any other fees associated with additional damage claims. Plaintiffs argue that all of the fees submitted to the court were incurred in prosecution of the bad-faith claim against Coregis. We find that the trial court's award of the total fees submitted by Plaintiffs was reasonable. The billing record reflects the extensive discovery required and preparation for trial of this matter, all of which is related to Coregis' failure to tender. The award of $59,000 in attorney fees to the Plaintiffs was proper.
Finally, Plaintiffs have requested an increase in attorney fees for work on this appeal. We find this to be appropriate and amend the judgment to include an additional $2,000 therefor.

DECREE
Having vacated the jury's damage awards, we hereby make this final decree and award Arthur Lewis the following: stipulated past medical expenses of $98,674.85; future medical expenses of $30,000; past lost wages of $20,247; and general damages of $40,000. We award Mr. Griffin the following: stipulated past medical expenses of $28,891.52; past lost wages of $800; and general damages of $5,000. These damage awards are subject to the $25,000 credit due State Farm for payments it made to both Mr. Lewis and Mr. Griffin.
Tonia Lewis is hereby awarded $5,000 for loss of consortium and Betty Griffin is awarded $1,000 for loss of consortium.
Having vacated the jury's awards of $125,000 in damages to each Plaintiff for Coregis' breach of its duty of good faith and the trial court's awards of penalties to both Plaintiffs under La. R.S. 22:1220, we make the following awards. Mr. Lewis is awarded $8,000 in damages resulting from Coregis' bad faith failure to tender payment and $16,000 in penalties under La. R.S. 22:1220. Mr. Griffin is awarded $2,500 in damages resulting from Coregis' bad faith failure to tender payment and $5,000 in penalties under La. R.S. 22:1220.
The judgment of the trial court awarding the Lewises and the Griffins $59,000 in attorney fees is affirmed. The Lewises and Griffins are awarded an additional $2,000 in attorney fees on appeal. Costs are assessed to Coregis Insurance Company.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
CARAWAY, J., concurs with written reasons.
CARAWAY, J., concurring.
One issue of the majority opinion requires my concurrence. In my opinion, nonpecuniary damages may not be used as the measure for the penalty awarded to the insured for the insurer's breach under La. R.S. 22:1220 (hereinafter "Section 1220"). Nevertheless, since the actual penalties awarded by the majority are otherwise within the penalty allowances of Section 1220 and La. R.S. 22:658, I respectfully concur in the majority's award of penalties.
*731 Section 1220 was passed in 1990 and its interpretation by the Louisiana Supreme Court has been limited. Theriot v. Midland Risk Ins. Co., 95-2895 (La.5/20/97), 694 So.2d 184 and Calogero v. Safeway Ins. Co. of Louisiana, 99-1625 (La.1/19/00), 753 So.2d 170, are the key rulings of the court. However, neither case focused on the "damages" language of Section 1220 and the scope of such damages. Theriot found no penalty, and Calogero applied the $5,000 penalty, not the double damage penalty.
Theriot is significant because of its more extensive review of the purpose and operation of Section 1220. Theriot discusses how Section 1220 extends penalties to "claimants" who are not in direct privity of contract with the insurer. The decision points out that "insureds" were already protected under La. R.S. 22:658 in the event of arbitrary non-payment by the insurer. The present case involves insureds and therefore the penalty of Section 1220(C) or La. R.S. 22:658(B) may apply.
Damages under Section 1220 are initially defined in Subpart (A) as "all damages sustained as a result of the breach." The referenced breach pertains to the insurer's duty of fair dealing, good faith and fair settlement, as discussed in the first two sentences of Subpart (A). The breach is clearly contractual when it involves an insured. This must be distinguished from the tortious breach of duty by the tortfeasor. The damages caused by the tortfeasor which include nonpecuniary damages are not the same "damages" defined in Section 1220(A). The insured's obligation to pay within its contractual policy limits is of course related to the damages caused by the tortfeasor. Nevertheless, the damages under Section 1220(A) caused by the insurer's breach are different. Section 1220(A) addresses damages for the breach of the insurer's special duties, not the insurer's unpaid obligation under its contract of indemnity. Thus, initially in interpreting Section 1220, it is important to note the distinctions among (i) damages caused by the tortfeasor, (ii) the insurer's contractual obligation to timely pay amounts up to the policy limits, (iii) "damages sustained as a result of the breach" by the insurer to timely pay, and (iv) the default penalty of $5,000 under Section 1220 which can be assessed in the absence of any actual "damages" resulting from the breach of the timely pay/good faith obligation.
Coregis's breach of performance in this case is the failure to pay a contractual money obligation owed to each insured. In such case, La. C.C. art. 2000 sets forth one aspect of the "damages" for the delay in paying a money obligation, i.e., legal interest. Additionally, La. C.C. art. 1997 provides for "damages, foreseeable or not, that are a direct consequence" of a bad faith breach of contract. These principles regarding damages apply for an understanding of the "damages" addressed in Section 1220. Section 1220 thus provides that if the insurer does not pay and acts in bad faith, the insured is entitled to any such damages additionally sustained because of that breach and a doubling of those damages as a penalty. For example, a fire insurer who does not timely pay the insurance proceeds after a fire might be responsible for its insured business owner's unforeseen and indirect losses from competition for not allowing the business to be rebuilt. Such insurer has also caused damages recoverable in the form of legal interest for its failure to perform.
Calogero involved a dispute over a collision (property damage) claim on the total loss of a truck. The value of the truck (less deductible, $7,675) was the basic measure of the policy obligation, and damages for non-payment of the policy obligation would have resulted in legal interest. Yet, because the insurer acted arbitrarily *732 in making payment, the court awarded an extra $490 which was the interest the insured had to pay on the truck loan during the time of the insurer's non-payment. This is the type of indirect and unforeseen pecuniary loss under La. C.C. art. 1997 that might be compensated because it results directly from bad faith, arbitrary conduct. I do not believe the plaintiffs in the present case attempted to prove these types of pecuniary losses other than legal interest, and as noted by the majority, such losses would not exist because the medical expenses and wage compensation were being paid by worker's compensation.
Importantly, the penalty in Calogero was not twice $7,675 or twice $490, but the fixed $5,000 penalty of Section 1220. I would read the court's options for a penalty in Calogero as either:
(i) twice $490 plus legal interest on the $7,675 caused by the breach;
(ii) $5,000; or
(iii) 10% on the amount found to be due from the insurer in accordance with La. R.S. 22:658 (10% x $7,675).
Since Section 1220 defines the penalty as "whichever is greater," the $5,000 was the correct penalty.
One other article concerning damages is La. C.C. art. 1998, which provides as follows:
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
The second paragraph of Article 1998 might be argued as the basis for the insured's claim against an insurer for mental anguish, nonpecuniary damages. Are those nonpecuniary damages within the scope of "any damages" as set forth in Section 1220(A)? I think not. As a general rule, mental anguish, nonpecuniary damages are not owed in a contractual setting like this. See, Nolan v. Commonwealth National Life Ins. Co., 28,777 (La.App.2d Cir.11/1/96), 688 So.2d 581. The second paragraph of Article 1998 provides an exception. Here, the jury was not charged under Article 1998 to determine whether Coregis "intended, through [its] failure, to aggrieve the feelings of" its insureds. The record does not support such claims. We do not usually award mental anguish damages for having to sue someone who owes a sum of money. See, La. C.C. art. 1998 and its comments, and Nolan, supra.
Despite my disagreement with the nonpecuniary damage rationale for the double damage penalty awarded by the majority, I concur in the result because the amount of the penalties are allowable otherwise. The $5,000 penalty assessed in favor of the Griffins is the default amount set forth in Section 1220(C) which may be assessed even in the absence of damages caused by the insurer's breach. The $16,000 penalty assessed in favor of the Lewises is allowable under La. R.S. 22:658 since it does not exceed ten percent of the amount owed to them under the policy.
APPLICATION FOR REHEARING
Before BROWN, STEWART, CARAWAY, DREW and MOORE, JJ.
Rehearing denied.
BROWN, J., would grant rehearing.
NOTES
[1] Dr. Patterson also treated Mr. Griffin for his neck, back and shoulder pain, which was completely resolved by his final visit with him in January 2000.
[2] Dr. Brown had treated Mr. Griffin for an unrelated knee injury in 1994. That injury involved tearing of the meniscus and required arthroscopic surgery. There was no involvement of the kneecap and Dr. Brown did not relate the current symptoms to the prior injury in any respect.
[3] Paragraph 9 of the Chronic Narcotic Treatment Consent/Agreement states:

9. I will not operate any type of automobile, vehicle, machinery, or ant (sic) other potentially hazardous device while taking narcotics. Though the chronic administration of these medications not necessarily impair mental function, I understand that operating potentially hazardous devices while taking narcotics could place others or myself at risk. I will not perform any potentially hazardous task while taking narcotics. Because narcotics can impair or decrease mental function, I will not make any important decisions or commitments without consulting responsible and trusted advisors while taking narcotics.
[4] Due to apparent changes within Coregis, several of the adjusters who were involved with these claims were no longer with the company and did not testify in the matter.
[5] We note that each of the doctors who treated Mr. Lewis, including the mental health professionals, testified that Mr. Lewis was taking his medications as prescribed. There was no testimony adduced to support the conclusion that Mr. Lewis was doctor shopping. The record indicates that Mr. Lewis received prescriptions for his pain medication only from Drs. Ellis and Forte and was compliant with the narcotic treatment agreement.
[6] The breach of the duty of good faith and fair dealing is different from the obligation to pay the contractual insurance proceeds. Subsection (A) is addressing damages for the breach of these special duties, not the unpaid obligation to fulfill the insurer's contract of indemnity.