CARAWAY, J.
l,In this slip and fall case, the plaintiff slipped on a mat as she entered the hospital-defendant’s clinic. Plaintiff further injured. her preexisting knee condition as a result of this fall. Following a bench trial, the trial court determined that the plaintiff was free from fault and slipped on a wet floor mat. Nevertheless, the trial court failed to find any lapse in the hospital’s inspection procedure for the condition of its floor so as to hold the hospital liable for the wet mat. The plaintiff appeals this adverse ruling. Finding manifest error in the trial court’s ruling, we reverse and render.

Facts

On July 8, 2009, Claudia Grinnell (“Grinnell”) fell while entering the Community Health Center (“CHC”), an affiliated facility with St. Francis Medical Center, Inc. (“St. Francis”). As she entered the- automatic glass door, Grinnell observed a “wet floor” sign and two large blue floor mats on the tile floors at the entrance of the CHC. As Grinnell stepped on the left mat, she alleges that she fell as the mat slid from underneath her. It is undisputed that the mat was wet with water at the time of the fall. The evidence revealed that the accident occurred around 9:00 a.m. and that the building had been open to the public since 8:00 a.m.
Grinnell was helped up by Bill Wilson (“Wilson”), a former employee of the CHC, who was picking up a prescription at the CHC pharmacy. Wilson confirmed the condition of the mat as he aided Grinnell: “It was a wet rug that was crimpled and wrinkled up like an accordion and she was on |gthe rug.” The plaintiff was subsequently treated for wrist and knee pain sustained in the fall and released a few hours after the fall.
*120 John Cameron (“Cameron”), filling in as security guard for an employee on vacation, filled out the handwritten incident report and took the plaintiffs statement, which noted the presence of Wilson and the fact that the fall was caused by a wet floor.
Grinnell subsequently filed this action for damages against St. Francis. The city court trial took place in 2012. Several people testified at the trial regarding the accident and potential causes of the wet mat. Grinnell testified that upon seeing the wet floor sign, she stepped on the left mat[1] to avoid the tile floor and immediately slipped. Grinnell stated that when she stepped on the mat it felt like she was stepping ón ice. She testified that she landed on her wrists and knees. She moved over and sat on the wet rug until Wilson helped her up. She had previously undergone an unsuccessful surgery on her left knee which was further injured in her fall.
Grinnell’s husband, Richard Wilson (“Richard”), also testified at the trial. After receiving a call about the accident from his wife, Richard proceeded to CHC. After checking on his wife, he traveled a block away to enlist the aid of an attorney and friend to investigate what happened to his wife. They returned to the hospital and claim to have spoken with Cameron.
| (¡According to a memo which Richard prepared upon return to the attorney’s office,[2] Cameron stated that:
They had pressure washed last night and apparently the next morning, the chemicals that were used in the pressure washing machine, got under the glass plate causing wet areas. There was an attempt to clean the chemicals off the floor on the morning of the incident, but there were still stains that could be seen on the floor. While we were there, there were towels on the inside against the base of the glass, all the way from the wall to the door opening.
According to Richard, Cameron informed them that the hospital windows are not properly sealed, resulting in water flowing in when the windows are power washed.
Cameron initially gave a deposition, introduced at trial, in which he did not remember anything regarding the fall, the plaintiff, or filling out an incident report. Cameron did, however, describe the approximate size of the mats, their placement at the entrance, and their function. In particular, Cameron was questioned about the mats, as follows:
Q. Have you ever seen those slide from the time that you worked out there?
A. No. No, sir. In fact, you’ve got to pull it. You can’t step on it and push it with your foot. You’ve got to pull the mat with your hands to move it.
It was not until the trial when the incident report was produced that Cameron “remembered” anything. Yet, he “remembered” only the details found in the incident report. He failed to recall any statement made to Richard or the attorney regarding the exterior windows having been power washed the night before the accident.
*121 14Wilson testified that he arrived at the CHC about 15 minutes before Grinnell fell. Since he used the same entrance as Grin-nell, Wilson stated he walked over a mat to enter, but could not say whether he stepped on the left or right mat. Wilson testified, “I didn’t see her fall but I saw her on the floor on this crumpled up rug.” He observed a wet mat when he helped Grinnell to a chair. Wilson denied that he slipped or almost slipped on a mat when he arrived. He was not asked whether the wet floor sign was present when he arrived or about any towels on the floor or against the windows.
Foy Gadberry (“Gadberry”) qualified as an expert in the field of civil engineering. He is also a building inspector for seven parishes. Gadberry testified that the walkway of the CHC slopes toward the entrance doors, rather than away from them. As a result, he stated that water drains toward the automatic door. Given the flat surface of the door’s threshold, Gadberry testified that water would likely come into the lobby of the CHC. He also stated that the glass windows had not been properly sealed, allowing water to seep into the CHC lobby.
Gadberry also testified about the floor mats, which have rubber on the bottom to keep them from sliding. Therefore, Gad-berry determined that the only way the floor mats would have slipped out from underneath the plaintiff is if “there was moisture under that mat.” Gadberry testified that the wet mat could have simply been caused by someone having mopped the floor that morning.
1 sChris Hilburn (“Hilburn”) is the landscaping, irrigation, and exterior cleaning contractor for St. Francis and the CHC. Hilburn testified that he subcontracts out the power washing on the outside windows at the CHC. As a result, he was not able to testify as to when the exterior windows were last power washed. Hilburn later identified the person who actually power washes the exterior windows as Chad Puckett. Hilburn testified that because of the problem of the water inside the building, he disconnected the sprinklers in front of the entrance of the CHC several years before the accident. The leakage occurred along the glass window/walls adjacent to the entrance doors.
The CHC director, Gail Blackman (“Blackman”), also testified. She revealed for the first time at trial the fact that the CHC hires an independent company, Holiday Properties, to clean the building and the name and existence of the CHC’s cleaning lady, Molly, who would have been present on the date of the accident. Blackman stated that the wet floor signs are put up only as needed, although once in awhile, the signs are left out after cleaning the night before.[3] Otherwise, she testified that it was the CHC’s policy to put these signs up only when an employee observed a spill or any liquid on the floor.
The trial court filed written reasons for judgment. First, the court stated that it was “convinced that this matter falls under the “reasonable care” standard for hospitals as set forth in Holden v. Louisiana State Univ. Med. Center-Shreveport, 29,268 (La.App.2d Cir.2/28/97), 690 So.2d 958, writ denied, 97-0797 (La.5/1/97), 693 So.2d 730. The court also ruled that the plaintiff was free from fault and fell on a wet floor mat. Relying on Wilson’s testimony regarding his crossing the mat 15 minutes earlier, the trial court ruled that it was “not convinced that St. Francis’s duty *122 encompasses an inspection of more often than 15 minutes.” Following Holden, the court held that the CHC did not act unreasonably in not discovering the wet floor mat before plaintiffs fall. The ruling appears based upon the assumption that the water was spilled by another party in the building immediately before the accident. Grinnell’s claim was dismissed, and she now appeals.

Discussion

A trial court’s findings of fact will not be disturbed on appeal unless the appellate court finds they are clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880 (La.1998). The appellate court may not reverse the trial court even if the appellate court determines it would have weighed the evidence differently if sitting as the trier of fact, as long as the trial court’s findings are reasonable in light of the entire record. Id. at 882. Where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous. Id. at 883.
This court has previously held that a hospital is not a “merchant” under La. R.S. 9:2800.6. As a result, hospital liability in a slip and fall case has been held to fall under the general negligence standards. See, Holden, supra; Reynolds v. St. Francis Med. Center, 597 So.2d 1121 (La.App. 2d Cir.1992). Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La. C.C. art. 2315. Under the negligence standard, a hospital owes a duty to its visitors to exercise reasonable care to keep the premises in a safe condition commensurate with the particular circumstances involved; but the duty owed is less than that owed by a merchant. Holden, supra; Reynolds, supra. The trial court must consider the relationship between the risk of a fall and the reasonableness of the measures taken by the defendant to eliminate the risk. Adams v. Louisiana State Univ. Health Sciences Center Shreveport, 44,627 (La.App.2d Cir.8/19/09), 19 So.3d 512, writ denied, 09-2056 (La.11/20/09), 25 So.3d 798; Holden, supra.
In Holden, this court observed that “[t]he presence of other members of the public passing through the [hospital] building raises a significant possibility that a spill was caused by the negligence of a third person;” Holden, supra at 961. Thus, a hospital owes a duty to its visitors to exercise reasonable care to keep the premises safe. This involves the reasonableness of the measures taken by the hospital to monitor its premises for such occasional third party spills.
The trial court’s ruling repeatedly referred to the 15-minute interval between the time that Wilson entered the sliding glass doors and the time of Grinnell’s entry and fall. Therefore, since Wilson did not remember the presence of any water 15 minutes earlier or have any difficulty ■with the mats, the court’s ruling appears to rest upon the conclusion that a third party spilled the water during that time and “that 15 minutes is reasonable to | sallow a wet mat to exist.” The trial court further concluded: “It would be unreasonable to expect St. Francis to have all the floor space of the complex covered more than every 15 minutes.”
St. Francis’s third party spill scenario, upon which the trial court rested its ruling, is nonetheless a circumstantial evidence defense regarding the cause of the spill. In contrast, however, Grinnell’s case rested upon circumstantial and direct evidence of the hospital’s own negligent maintenance of its building in causing the water problem and failing to properly clean it up.
*123 Grinnell’s claim that the negligence of St. Francis caused the water hazard rests upon the following assertions:
(1) Water was present, dampening Grin-nell’s clothing;
(2) St. Francis’s wet floor sign had been placed at the entrance;
(3) There was a water leakage problem around the base of the glass window/walls adjacent to the entrance door;
(4) Power washing of the glass windows regularly occurred;
(5) Towels were on the floor next to the glass window/walls;
(6) The mats had a rubber underside with carpet on top;
(7) The mat was difficult to wrinkle and shift when positioned on a dry floor;
(8) Grinnell’s fall caused the mat to crumple up, in an accordion-like manner;
(9) The expert testimony was that the mat could slip with water under the mat;
(10) While Grinnell fell on the mat on the left side of the entrance, Wilson was not questioned regarding his entry across the mats.
While we find that most of these assertions represent facts, undisputed at trial, we find it necessary to scrutinize further the towels, the power washing and the expert’s conclusion along with Richard’s testimony concerning the damaging admissions of Cameron.
|9In Richard’s testimony, he made reference to a memo which he and his attorney prepared on the day of the accident immediately after their inspection of the CHC entrance. He specifically identified on the date of the accident two practices regarding building maintenance which were later confirmed by other witnesses familiar with the building. One was the use of towels for a water leak around the base of the glass windows/wall adjacent to the sliding glass doors. The other was the use of a power washer around the outside of the building. The defense witnesses did not dispute that those practices had previously occurred causing water around the entrance, thus partially corroborating Richard’s report. The pharmacist at the CHC did not remember towels in use on that date, but she did not leave the pharmacy to attend Grinnell after the accident. Thus, her testimony did not directly dispute Richard’s reported observation of the towels after the accident.
Richard testified to Cameron’s damaging admissions made on the morning of the accident. In Cameron’s deposition and live testimony, he never disputed admitting the efforts on the morning of the accident to clean the residue on the floor caused by the power washing the night before because of his lack of memory. He did not remember any power washing incident, and indeed, he did not even remember aiding Grinnell after the accident.
Also, concerning this information gathered by Richard after the accident, St. Francis’s witnesses identified two persons who worked around the building on its behalf, the cleaning lady and the power washer | ^maintenance person. Nevertheless, despite its control of those persons who performed work for the hospital, St. Francis did not call them to testify.[4]
The design of the mat and its condition after the accident further support the plaintiffs case. A photo of the mat overturned shows its design for rubber trac *124 tion. Its top side with carpet is obviously designed to allow for traction even during a rain event when water is dripped by persons entering the building. Yet, it is undisputed that Grinnell’s fall caused the mat to slip and be wrinkled together like an accordion. The idea that a third party spill on top of the mat allowed the mat to slide and wrinkle together is a weak explanation of this water-related event. Instead, the plaintiffs expert opined that a mat placed on a recently mopped floor would allow for the slippage of the mat. Finally, there were two mats in question at the door. Therefore, Wilson’s earlier entrance across the area without identifying the mat upon which he walked does not eliminate the possibility of a problem with moisture under a mat.
Therefore, we find that the above list of facts for St. Francis’s negligent cleanup of the water is sufficient to show, more probably than not, that water had been on the floor prior to Grinnell’s entry and that dampness left under a floor mat caused the accident. Cameron’s admission was never denied, and the expert testimony was not seriously challenged by the defense. The ever-present third party spill possibility which the trial court used for its ruling must be deemed as speculation in this instance as it is l^discredited by the direct evidence supporting plaintiffs case. Accordingly, we find that the trial court was clearly wrong in not finding that the wet mat slipped as a result of the hospital’s earlier attempted clean up of the water on its floor.
Having determined the issue of liability, we found that the medical testimony reveals that the slip and fall exacerbated the plaintiffs preexisting left knee injury and caused back pain for about a week. Her preexisting left knee condition resulted from a 2005 car accident and an unsuccessful surgery. Her preexisting condition was severe chondromalacia patella which was described by her physician, Dr. Owen Meyers, as follows:
[Chondromalacia] is a term that can be utilized for any cartilage surface in the body ... In her case, the undersurface of her kneecap is very irregular and damaged and, um, that’s referring to that chronic irregularity that’s chronically rubbing the inside of the knee.
As a result of the prior injury, the plaintiff was in constant pain and already limited in her movements. In fact, the plaintiff entered the CHC in order to pick up a pain patch for her left knee.
Nevertheless, the plaintiff was immediately admitted to the hospital after the fall and her knees and wrists were x-rayed. None of the x-rays revealed any fractures or dislocations. The plaintiffs left knee x-ray merely revealed a “degenerative left knee joint without fracture or dislocation.” The plaintiff was prescribed an anti-inflammatory and was subsequently discharged.
Dr. Meyers testified that the plaintiffs pain level in her left knee increased for several weeks as a result of the fall. Due to the increased pain 112and swelling resulting from the fall, Dr. Meyers referred the plaintiff to a specialist.
The plaintiff was referred to Dr. Jeffrey Counts, an orthopaedic specialist at the North Louisiana Orthopaedic and Sports Medicine Clinic. Dr. Counts reviewed the recent x-rays and MRI, noted the plaintiffs preexisting degenerative joint disease, and determined that the plaintiff suffered an MCL sprain. According to the specialist, an MCL sprain would take several months to fully heal. Over the course of three to four months, Dr. Counts tried several types of injections that were either unsuccessful or only temporarily successful in reducing the plaintiffs pain. Next, Dr. *125 Counts recommended pain management treatment, but the plaintiff chose to return to Dr. Meyers to merely adjust her pain medications.
Dr. Meyers testified that the plaintiffs pain and swelling in her left knee lasted for awhile. He could not specify exactly how long it took the plaintiffs knee to stabilize to its pre-accident, preexisting condition status, but he stated that her knee did return to its previous condition. At trial, the plaintiff submitted medical bills from all the doctor visits and tests which amount to a total of $2,527.80. These medical bills are reasonably documented and thus the plaintiff is entitled to the cost of these medical expenses.
General damages are those which cannot be fixed with pecuniary exactitude. Lewis v. State Farm Ins. Co., 41,527 (La.App.2d Cir.12/27/06), 946 So.2d 708; Maranto v. Goodyear Tire & Rubber Co., 25,114 (La.App.2d Cir.5/10/95), 661 So.2d 503. There is no mechanical rule for | ^determining general damages; rather, the facts and circumstances of each case must be considered. Maranto, supra. The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. Jenkins v. State ex rel. Dept. of Transp. & Dev., 06-1804 (La.App.1st Cir.8/19/08), 993 So.2d 749, 767, writ denied, 08-2471 (La.12/19/08), 996 So.2d 1133; Lewis, supra.
A defendant takes his victim as he finds him and he is responsible for all the natural and probable consequences of his tortious conduct. Smith v. Escalon, 48,129 (La.App.2d Cir.6/26/13), 117 So.3d 576; Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70. Where the defendant’s negligent action aggravates a preexisting injury, he must compensate the victim for the full extent of this aggravation. Guillory v. Lee, 09-0075 (La.6/26/09), 16 So.3d 1104, 1124; Perniciaro v. Brinch, 384 So.2d 392, 395 (La.1980). Although the damages are greater because of a prior condition of the victim which is aggravated by the tort, the tort-feasor is, nevertheless, responsible for the consequences of his tort. Caskey v. Merrick Const. Co., Inc., 46,886 (La.App.2d Cir.3/14/12), 86 So.3d 186, writ denied, 12-0847 (La.6/1/12), 90 So.3d 442; Britt v. City of Shreveport, 45,513 (La.App.2d Cir.11/3/10), 55 So.3d 76.
In this case, the plaintiff requests $25,000 for pain and suffering and disability. As a result of the fall, the plaintiff, who teaches at a university, had to teach more online classes due to her inability to stand or walk very far after the fall. She also testified that she was in significant pain for months after the fall and her knee would often swell. Regardless, the 114plaintiff was able to travel to Germany for a month in October, and was already using daily pain medications for her left knee. After considering the plaintiffs preexisting condition, daily pain, and the testimony of Dr. Meyers regarding her recovery, we award general damages in the amount of $16,000.
Finally, Richard presented a claim for loss of consortium. From our review of the evidence presented concerning the aid and assistance he provided his wife for her knee condition, we find little change in the situation before and after the accident, enough to warrant an award for loss of consortium.

Conclusion

For the above reasons, the judgment of the trial court is reversed. Judgment is hereby rendered in favor of Grinnell in the amount of $18,527.80 plus legal interest. Costs of appeal are assessed to appellee.
REVERSED AND RENDERED.

. From the evidence and photos, two mats were placed side by side, lengthwise, at the opening of the double sliding glass doors. The mats appear to be approximately 3 feet wide and 5-8 feet long.

. The trial court overruled an objection to the introduction of this memo even though it clearly reflected not only Richard's investigation on the date of the accident, but also the observations of his trial attorney. Nevertheless, Richard confirmed in his separate testimony the substance reflected in this July 8, 2009 memo.

. The CHC pharmacist testified that the wet floor signs are left on the dry floor on many occasions,

. The "uncalled witness” rule gives rise to an adverse presumption when a party has the power to produce witnesses who would elud-date the occurrence and fails to call those witnesses. Bartley v. Fondren, 43,779 (La.App.2d Cir. 12/3/08), 999 So.2d 146.