CARAWAY, J.
11While carrying her one-year-old child, the pregnant plaintiff slipped and fell immediately upon entering the defendant’s office building on a rainy day and received injuries to her left buttock, knee and tail bone.- A negligence suit was filed against the defendant for failure to protect its customers from the wet condition of the entrance.. After a bench trial, the parties were assessed with equal fault and damages were awarded accordingly. Finding no manifest error in the trial court’s judgment, we affirm.

Facts

On the drizzly afternoon of April 3, 2013, Jameica Flipping went to the leasing office of JWH Properties, LLC (“JWH”), located on the corner of Claiborne Street and Mansfield Rqad in Shreveport. Flipping wanted to report items needing repair in the house she rented from JWH approximately ten days earlier. Flipping had visited the leasing office three or four times before.
At the time of her visit, Flipping was four months pregnant and had her one-year-old daughter with her. Flipping parked her car “on the side of the building,” removed the 25-pound child from her car seat and “put her on my [right] hip.” Flipping reported that she proceeded “around the building and down the sidewalk [alongside Mansfield Road], and went *152 to open the door.” Flipping “swung” the door open with her left hand and “stepped up on the doorframe,” with her right foot. She stepped into the building with her left foot and began to slide. Flipping stated that “you have to step up” to |2get inside the building. The door opened to the inside to the right. Flipping stated that “as soon as” she stepped “inside the building,” her left foot “instantly slid,” out “further into the building.” She knew she was “getting ready to fall, because [she] had slipped,” In an effort to not drop her baby, she “hit” the doorframe and the wall with her left side back. Flipping stated that she “somehow twisted my leg or my knee,”* ás she went down, ultimately hitting her buttocks -on the inside of the building, causing her pain in her upper and lower back, tailbone and knee. Flipping claimed to be “all the way inside the door” when she fell.
On March 24, 2014, Flipping filed'a negligence suit against JWH for its failure to protect its customers from a known dangerous condition. Flipping sought damages for past, present and future medical expenses, physical and mental pain and suffering, permanent injuries and disability and' loss of wages and enjoyment of life!
JWH answered the petition and filed a third party demand against the City of Shreveport for the negligent failure and refusal to maintain the drainage system in front of the subject building that caused pooling of water on the street and sidewalk up to the threshold of the building. The City of Shreveport was dismissed from the action upon the sustaining of an exception of no cause of action by. the trial court. JWH then amended its answer to allege as an affirmative defense the fault of the City of Shreveport.
A bench trial was held on June 18, 2015. The parties stipulated to the amount of Flipping’s medical expenses and lost wages and the fact that she |awas not placed on any work restrictions as the result of the fall. Flipping testified about the fall as noted above. She added that she wore “tennis shoes” and was not in a hurry. Flipping saw water near or around the door she described as “muddy puddles along the sidewalk.” The puddles were off to the side of the entrance, “not even a foot.” Photos of the entrance show a small awning extending from above the door. Flipping was not aware of the condition of the floor inside the building. She recalled that the building was “not lit well.” She did not look down inside the door to examine the floor. ' ■
After she fell, Omekia Giles, an employee of JWH,-came over to see if Flipping was' okay. She helped Flipping up and, according to 'Flipping, - Giles stated that there was supposed to be a rug down. Flipping recalled that a white man with a medium build was “standing over to the side,” and Giles asked him to get the rug. Flipping saw no rugs or wet floor signs. She noticed' the'floor was wet after'she fell. Giles assisted Flipping to a chair until an ambulance was called.' •
Flipping experienced the worst pain in her lower back for a duration of a couple of months. At the time of trial, she still experienced low back pain and had trouble standing for long periods of time and placing with her children. The pain in her tail bone and knee had substantially resolved.
Omekia Giles testified that she is a secretary for JWH and the ¡only individual who works in the office. Her job.includes taking tenant complaints and coordinating maintenance at rental properties. Giles admitted that it is her responsibility to keep the office building clean and Ufree of hazards including water on the floor. The building in question has one entrance for customers, the front door that looks out-directly onto Mansfield Road.
*153 Giles conceded that the tile around the front door, “gets wet there,” and is a hazard because water on the floor is slippery. Giles also agreed that the water is difficult to see because it , is clear. Giles testified that when the floor of the office got wet she mopped it up and that “when it>’s wet outside and raining Fm going to make sure everything is going to stay dry.” It-was her job to always “make sure that front entrance is dry and secure.” She kept a mop “sitting in the corner of [her] office,” “to keep the tile dry.” Giles also kept a mat in front of the door and picked -the mat up- only when she mopped the water up. When she finished mopping, Giles replaced the mat. When it rained, Giles habitually checked the floor in front of the door often, more than once a day. She also walked people to the door when they left the building.
Giles explained that the inside mat was kept in front of the door all the time because of an outside “drain in front of the office” that did not. work well. Giles stated that sometimes “rain can come through there,” and “flood[ed] up to the front door.” She stated that the drain is “about three, two feet from the front door.” Giles testified that the water did not always come inside the building, but “when a car [came] and splash[ed],” the - water '“splash[ed] up in that doorframe.” Giles also stated that when it rained, water pooled outside the building near the threshold of the door. Giles complained to the'City of Shrevéport about the drainage problems.
|flGiles testified that when Flipping fell, it had been raining since the night before the accident. She stated that there “was some water there, but it wasn’t flooded like it normally be flooded, but it was some water standing there.” • On the day of the accident, there was no water inside the building according to Giles, but she had placed the wet floor sign inside. . ..
; Giles ‘Witnessed Flipping’s fall. She stated that she did not see -Flipping exit her car but saw her as she walked toward the front door while holding her baby; she was not running. ' Giles déscribed Flipping’s gait as “walking fast with a pace.” She testified she saw Flipping put her right foot on the • threshold of “that door-frame.” According to Giles, Flipping never did get inside the building,- but when she placed her right foot on “that threshold she started sliding.” Giles testified that Flipping “fell in the doorframe, not inside the building.” Giles recalled that Flipping- “slid down the doorframe with her baby on her right hip,” and “the [left] side of her stomach hit the side of that door, and she slid down.” Giles recalled that Flipping’s left knee hit the. “threshold of that door, that door plate.” According to Giles, the one-year-old child did not fall; she remained on Flipping’s hip during the incident,.-.
Giles-remembered that only Flipping’s knee was wet from the threshold. She recalled that Flipping wore “rubber clog shoes.” Giles, testified- that nobody else was in the office at the-time that Flipping fell. Ultimately Jason Hyde, the office owner, came into the. office while the paramedics attended to Flipping.
| ^Regarding the condition of' the floor, Giles testified that she had escorted a man to the door approximately ten minutes before- -Flipping arrived. At that time she checked the floor in front of the mat and confirmed it was dry. Giles acknowledged, however,,that the “silver” threshold where Flipping slipped was wet. She stated that it is “on the outside of that door, the frame of that door.” According to Giles, there was no water inside the door. She stated that she was sure “that mat was right there at the door.” -
*154 From the photographs taken after the day of the accident, Giles identified the place where Flipping parked, potholes on the street in front of the office, the front of the building with awnings, and the asphalt without a curb that connected with the sidewalk in front of the building. Giles testified that she contacted the City to correct the problem, and they “re-tarred the street, but it still looks like this right today,” with no curb there. Giles recalled that on the day of the accident, she got splashed from traffic a little bit.
Giles identified a photograph showing filled potholes; she claimed that the City of Shreveport filled those after the suit was filed. From photographs, Giles identified the office lobby facing the doorway. She described the mat shown in the photograph as a “slip-resistant rubber mat,” and identified that caution sign located behind the mat. Giles stated that the caution sign was always there, but when it is not raining, it was moved to the side. On the day of the accident, Giles positioned the sign so that anyone opening the door could see it. She also made sure the mat was in 17place. She mopped up any water up before Flipping’s arrival. Giles also identified photographs of the lobby and the view she had of the door from her desk when Flipping opened the door. She saw Flipping pass by in the left window on the day she fell and knew she was going to enter the office.
Giles identified D-8, a photograph of the inside mat from the outside of the partially open door, attached to this opinion. She stated that usually the mat is closer to the door than shown in the photograph. Giles testified that Flipping never stepped on the mat as her slip occurred on the metal threshold. Giles told the court that the door cleared the mat when the door was open and that there was a mat outside but it was an exterior mat, not a slip-resistant mat. No warning signs were located outside the building.
Upon examination by the trial court about D-8, Giles testified that the silver metal threshold had no nonstick tape on it and is “just smooth, slick.” On cross-examination by the plaintiff, she reiterated that there was no warning sign on the exterior of the building and no slip-resistant or water-resistant mat. Giles described the threshold as “rough-like,” agreeing with counsel’s description of it having 8-10 raised ridges of metal.
Jason Hyde, the owner of JWH, testified that he was not present when Flipping fell and did not witness the condition of the floor prior to her fall. He admitted that he did not provide any of his employees training on the identification of liquid hazards on the floor of the office and did not communicate to Giles what she needed to do when she saw water on the floor. He knew that there was a wet floor sign on the office floor all of the time, along with a mat. Hyde owned the building in question for about ten 1 ¿years. He stated that when it rained hard, water pooled outside the building. Hyde testified that when a car passed by it splashed water into the building which is why Giles had a mat and wet floor sign inside.
The defense later recalled Jason Hyde to the stand. He stated that “the drain backs up,” and “it overflows.” Hyde stated that “we’ve called the City several times,” but he did not talk to them himself. Since the City filled the potholes, Hyde testified that the situation is better. Hyde described the two mats near the building and the yellow caution sign kept inside the door. He confirmed his arrival at the office after Flipping fell. He saw no moisture on her clothing and stated the she wore “Crocs®, some plastie shoes.” He testified that it “looks like some she has on right now.”
*155 After considering the evidence and testimony,- the trial court rendered judgment in favor of Flipping, awarding $7,552 past medical special damages, $174 lost wages and $15,000 general damages, but assessed fault for the accident equally between the parties.
Immediately after the trial, the court issued oral reasons for the judgment. The court found that the accident occurred as Giles and Flipping described it after determining that their descriptions of the event were “very similar, if not identical to what actually happened.” The court concluded JWH was on notice of the water problems as a dangerous condition and should have taken greater measures on the outside of the building and the metal threshold. Regarding the inside of the office, the court determined that JWH should have had a larger mat on the inside of the door and made sure that the mat stays pushed up against the threshold itself.
bFor her familiarity with the business entry and the Croc®-style shoes she wore, the court assessed Flipping with 50% fault.

Discussion

I.
From this judgment, JWH has appealed urging manifest error in the factual conclusions of the trial court in determining that JWH negligently maintained the entrance to its premises. Specifically, JWH contends that the court improperly relied on evidence outside the record, with-. out expert testimony, to conclude that certain measures should have been done to the metal threshold to prevent slippage. JWH argues that the hazard was open and obvious for which it owed no legal duty to Flipping.
Contrary to JWH’s assessment, our view of the trial court’s reasons for judgment did not reject Flipping’s testimony that her first step into the building landed with her left foot on a wet and slippery location on the tile floor and not on the inside mat. That step, which caused her fall according to Flipping, was made after the prior step with her right foot which had landed on the metal threshold. As the door was opened, Flipping first stepped up from the street level with her right foot onto the threshold and then into the building with the left. (See attached Photo D-8).
The trial court indicated in its reasons that Giles’s and Flipping’s versions of the slip were -“very similar, if not identical.” The record does not support that conclusion as Giles observed the crucial slip of the foot on the metal threshold. Nevertheless, the trial court went on to emphasize facts tending to support Flipping’s view. It stated that JWH should have used a |inlarger inside mat which should have been pushed up against the metal threshold. As shown by the attached Photo D-8 taken after the accident date, the mat’s misplacement at the door, which is crucial to Flipping’s testimony of her slip on the tile, could have occurred to allow for the possibility of Flipping’s left-foot fall as she described. The fact that the trial court did not reject Flipping’s testimony of her slip on the tile requires us to view the accident from that perspective. Moreover, despite any conflict in the trial court’s reasoning or expressions of the facts in its oral reasons, the appellate court reviews the judgment and not the reasons for judgment. Wooley v. Lucksinger, 09-0571 (La.4/1/11), 61 So.3d 507.
JWH is not considered a “merchant” under the merchant premises statute of La. R.S. 9:2800.6(0(2). Nevertheless, every act whatever that causes damage to another obliges him by whose fault it happened to repair it. La. C.C. art. 2315. Under our negligence standard, a business owner owes- a duty to its visitors to exercise ■ reasonable care to *156 keep the premises in a safe condition commensurate with the particular circumstances ’ involved; the -duty is less than that owed by a merchant under La. R.S. 9:2800.6. The trial court must consider the relationship between the risk of a fall and the reasonableness of the measures taken by the defendant to eliminate the risk. Grinnell v. St. Francis Med. Ctr., Inc., 48,249 (La.App.2d Cir.8/21/13), 156 So.3d 117. For example, a hospital, which' is a nonmerchant business, owes a duty to its visitors to exercise reasonable care to keep the premises safe. This involves the reasonableness of the measures taken by the hospital to monitor its premises for such occasional third party or other spills. Id.
In The merchant’s duty under La. R.S. 9:2800.6 in dealing with the water that is tracked in and possibly dripped throughout the premises on a rainy day is to exercise reasonable care to promptly alleviate the wet areas and to alert customers to the constant threat of water that might drip to the floor as 'the result of other customer’s activities. The appropriate measure is whether the trial court could reasonably conclude that the defendant’s rainy day safety measures were organized, prudent and reasonable. Ferlicca v. Brookshire Grocery Co., 50,000 (La.App.2d Cir.9/4/15), 175 So.3d 469.
Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under La. C.C. art. 2315 for the act or inaction of a defendant. In order for liability to attach under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty' element); (2) the defendant failed to conform his or her conduct to the appropriate standard of-care (the breach of duty element); (3) the defendant’s substandard conduct was a 'cause-in-fact of the plaintiffs injuries (the - cause-in-fact element);' (4) the defendant’s substandard -conduct was a legal cause of the plaintiffs injuries (the scope of protection element); and (5) actual damages (the damage element). Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270; Pamplin v. Bossier Parish Community Coll., 38,533 (La.App.2d Cir.7/14/04), 878 So.2d 889, writ denied, 04-2310 (La.1/14/05), 889 So.2d 266.
Defendants generally have no duty to protect against ah open and obvious hazard. If the facts of a particular case , show that the complained-of 112condition should have been obvioüs to all, the condition may not be unreasonably dangerous, and the défendant may owe no duty to the plaintiff. Broussard v. State ex rel. Office of State Bldgs., 12-1238 (La.4/5/13), 113 So.3d 175; Dauzat v. Curnest Guillot Logging, Inc., 08-0528 (La.12/2/08), 995 So.2d 1184; Dowdy v. City of Monroe, 46,693 (La.App.2d Cir.11/2/11), 78 So.3d 791. When the risk is open and obvious to everyone, the probability of injury is low and the thing’s utility may outweigh the risks caused by its defective condition. Broussard, supra.
Accepting the fact that Flipping’s left foot stepped into the building onto the damp tile and caused- her to slip, the trial court’s finding of fault-on JWH is affirmed, JWH had a duty to have rainy-day safety measures that were prudent and reasonable at this customer entrance. The entrance by the customer into JWH’s building On a rainy day required - Flipping to make a step up from the wet outside level of the pavement onto the damp tile while opening and moving back the door. The small awning on the outside of the door still allowed a customer some exposure to the elements. In that overall setting with the customer escaping the rainy conditions *157 outside, the failure of JWH to maintain a mat for the customer stepping up and onto a damp floor amounted to. a breach of its duty under these circumstances.-
The need for a mat and its reasonableness were conceded by JWH’s having the mat present in the first place. Yet, with Flipping’s momentum coming through the door, she landed on damp tile and not the mat which was necessary to accommodate the water brought into the building by other customers or Flipping, The reduction of skids by a mat allows the wet | ^customer a safe transition place at this entry under these circumstances. Yet, the record supports a factual determination that the mat was not properly placed at the doorway so as to prevent the risk encountered by Flipping.
Significantly, after Flipping’s testimony of her left-foot slide on the tile, Giles’s testimony was less than definitive concerning the location of the mat. The trial court accepted Flipping’s version of her fall which placed the cause of her fall on the absence of the mat in place to accommodate her step into the building.[1]
Finally, we do not find that the dampness on the floor was an open and obvious hazard. Moreover, the bottom of Flipping’s shoe would be expected to remain wet as she had just walked from the wet sidewalk to reach the building.
II.
JWH also urges error in the trial court’s fault determination. We find no manifest error in the trial court’s apportionment of fault. The trial court reasonably accepted the testimony that Flipping wore Croc®-like shoes, disregarding her contrary testimony. The record clearly shows that both Flipping and Giles were aware of the rainy conditions and the risks associated with wet surfaces.
The allocation of fault is a factual determination which is reviewed under the clearly wrong standard. Thompson v. Winn-Dixie Montgomery, Inc., 15-0477 (La.10/14/15), 181 So.3d 656. Fault is evaluated under these factors: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and, (5) any extenuating circumstances which might require the actor to proceed in haste -without proper thought. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985).
Applying these factors to the facts of this case, we find that no one factor weighs heavier than any other in favor of either party. JWH’s lack of diligence regarding the handling of the mat and floor inside the building and Flipping’s unwise choice of footwear with knowledge of the dangers of slippery surfaces support the equal allocation of fault by the trial court.
III.
Finally, JWH contends that the trial court erred in failing to assess the City of Shreveport with any fault in this matter.
The court is required to determine the fault of all persons causing or contributing to injury, death or loss, regardless of whether the person is a party to the action or a nonparty. State, Dept. Of Transp. & Dev’t v. Cecil, 42,433 (La.App.2d Cir.9/19/07), 966 So.2d 131, writ *158 denied, 07-2063 (La.12/14/07), 970 So.2d 636. The person alleging the fault of a nonparty must prove it by a preponderance of the evidence. Id.
Despite claims that the actions of the City allowed water to pool and splash into the front door of the building, there was no evidence that on- the l^day of the accident, such pooling and splashing had occurred. In fact, Giles testified that there was no water inside the building and that the flooding and pooling outside was not problematic on the day of the, accident. Instead, the evidence shows that wet circumstances were caused by the normal falling of rain and the transfer of water to the threshold as people entered and exited the building. Prom this evidence, we find no error in the trial court’s determination that JWH failed to prove by a preponderance of the evidence any fault on the part of the City in causing the accident.

Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to JWH.
AFFIRMED.
*159 [[Image here]]

, Because we determine that the wet tile created an unreasonable risk of harm, it is unnecessary that we discuss the evidentiary and factual issues raised regarding the metal threshold.